UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK                    Chapter 7
--------------------------------------------------------------------------X
In re:
                                                                Case No. 13-45106-CEC
VIKI DEVANI,

                                        Debtor.
--------------------------------------------------------------------------X

## REPLY AFFIRMATION

        JOHN S. DESIDERIO, the undersigned, an attorney at law duly admitted to practice before

the Court of the State of New York, admitted in the Eastern District of New York, and being fully

familiar with the facts and circumstances set forth herein, affirms the truth of the following under

the penalties of perjury:

        1.      This affirmation is submitted in reply to the opposition of Debtor, filed January 30,

2014 (the "Opposition", consisting of an affirmation of Sobers, "Sobers' Aff.", Debtor's affidavit,

"Debtor's Aff", and a memorandum of law, "Debtor's Memo") to the motion of Creditor for an

Order dismissing the Debtor's Chapter 7 case for cause pursuant to §707(a), and imposing sanctions.

## DEBTOR'S ALLEGED HEALTH ISSUES & LACK OF BUSINESS ACUMEN

        2.      Debtor's alleged health issues in 2001 (Sobers' Aff. ¶¶2, 3, 9, 65 & Debtor's Aff. ¶¶4

- 7) - a non-cancerous tumor which caused nerve damage in his leg and arm – while certainly tragic

for Debtor, bears absolutely no relevance to Debtor's bankruptcy filing in August 2013 or Creditor's

motion, and is nothing more than an *outrageous and wholly improper* attempt to elicit sympathy for

the Debtor.  There is simply no other rationale for repeated reference to it in the Opposition.

        3.      While not a factor to be considered under the bad faith analysis employed by Courts

in this Circuit,[1] Sobers' allegation of Debtor's lack of business acumen (Sobers Aff. ¶34 & Debtor's Memo ¶40), *unsupported in Debtor's own affidavit*, is disingenuous at best.

4.      The Debtor's:

(i)      LinkedIn profile states that Debtor attended Queens College and thereafter attended and graduated from Baruch College with a BBA in Finance in 2008, and that he has been the Vice President of HealtheTime.com since June 2008 ("Exhibit A-1" hereto);

(ii)      XING profile states that Debtor has a BBA in Finance from Baruch College, and that he worked for JP Morgan Chase as a marketing intern in 2004, for UBS as an intern in Wealth Management in 2006, for Deutsch Bank as an intern in Accounting Policy Group in 2007, for Wachovia Bank as an intern in Equity Derivatives Product Control in 2008, and as Assistant Manager of Quantum Leap Natural Food Market from 2005 through 2008 ("Exhibit A-2" hereto); and

(iii)      Tweeter page ("Exhibit A-3" hereto) contains numerous business/finance related postings by the Debtor, wherein the Debtor comments, for example:

(a)      "macroeconomically speaking, things aren't good, so why a run up, I say irrational exuberance" (April 24, 2009);

(b)      "there are some fundamentals that are looking better, but then again, unemployment just might add a new twist to things" (April 19, 2009);

(c)      "companies are unwilling to sell an asset, because they would have to do so at such depressed prices, losses are never acceptable" (March 18, 2009); and

(d)      "even if an asset is not very liquid, it is liquid enough to the point that there may be at least one buyer and one seller" (March 14, 2009).

5.      Debtor attended two colleges, has a baccalaureates' degree in finance, experience working in several investment banks, has engaged in complex business discussions online, and has formed, owned, and been an officer and/or assistant manager of, numerous businesses since at least 2004. There can be no doubt; Debtor is knowledgeable as to business operations and his obligations as an owner/officer thereof.

---

[1]      If raised, sophistication of a debtor is a factor to be considered in an analysis of an objection to discharge pursuant to Section 727(a)(3), but is not an enumerated factor of the bad faith analysis of a debtor's filing.

6.      Clearly, Sobers' attempt to present Debtor as an unsophisticated businessperson is nothing more than a complete fabrication.

## DEBTOR'S BAD FAITH FILING

7.      Initially, Sobers' assertion in the Debtor's Memo that the existence of, "a split [in this District] in the standard of review and analysis to be employed for bad faith indicates that the analysis under §707(a) for bad faith is wholly inappropriate," (Debtor's Memo, ¶13) is plainly false, and completely ignores the numerous cases in this very Court, much less this District, which have undertaken a bad faith analysis of a debtor's filing under §707(a).  [*See e.g.,* In re Parikh, 456 B.R. 4 (Bankr. E.D.N.Y. 2011); In re Aiello, 428 B.R. 296 (Bankr. E.D.N.Y. 2010); In re Lombardo, 370 B.R. 506 (E.D.N.Y. 2007); In re Mazzalla, (Bankr. E.D.N.Y. 2007); In re Blumberg, 263 B.R. 704 (Bankr. E.D.N.Y. 2001)].

### Debtor Filed in Response to a Single Judgment – to Frustrate a Single Creditor

8.      Sobers and Debtor do not dispute that Debtor filed the instant Chapter 7 case in response to Creditor's Judgment and his enforcement thereof.  In fact, the entire Opposition can only be read as to support this determination.

9.      This Court must conclude that Debtor filed his bankruptcy case in response to Creditor's Judgment and his enforcement efforts, and to frustrate Creditor.

### Debtor Failed to Make Any Attempt to Pay the Judgment

10.      In the Opposition, Sobers and Debtor concede that Debtor has not made a single payment on the Judgment since it was initially entered in March 2013.

11.      Instead, Debtor attempts to focus the Court's attention on payments made pursuant to a settlement arrangement extended by Creditor in the State Court Action, intended to avoid protracted litigation and additional expense to Creditor - who has had to chase the Debtor's father and co-debtor, and the Debtor for the past 10+ years, through State Supreme Court, the Appellate

Court, and the Bankruptcy Court – to deal with repeated contemptuous conduct, meritless motions, multiple intentional fraudulent conveyances, and multiple bad faith bankruptcy petitions.

12.     As Judge Grossman stated in Creditor's action against the co-debtor of Debtor's father, "an attempt to settle the valid pre-petition state court judgments for less than the full amount and receive a release of liability in exchange, is not an attempt to *pay* the judgments" [In re Parikh, at 24].

13.     Debtor did make multiple payments under the *settlement agreement*.  However, nearly half of those payments were untimely.  And, contrary to Debtor's assertion that he paid 98% of the settlement amount (Debtor's Aff. ¶49), Debtor himself admits in the same affidavit that he failed to make the balloon payment and final payment due under that settlement (Debtor's Aff. ¶41), which amounted to just less half of the total settlement amount (Debtor's Ex. B).  Debtor failed to comply with the settlement agreement, Creditor then entered his Judgment for the full amount of the fraudulent conveyances (as he was entitled to, and as the State Court determined was wholly proper), and Debtor then failed to make a single payment on the Judgment.

14.     Finally, despite Debtor's ability to make the aforesaid settlement payments, to raise more than $12,400.00 (the amount held in escrow), to hire two separate attorneys to represent him in the State Court Action, to fund the instant bankruptcy case, to organize and fund new business after new business, and the fact that there was approximately $100,000.00 monthly moving through his business (at least the only one Debtor has provided any records for) at the time of his filing, the fact remains, Debtor failed to make any attempt whatsoever to make any payment on the Judgment since its entry against him in March 2013.  Debtor has money, and the apparent ability to raise funds at will, he just refuses to pay his debts – at least those he owes to non-insiders.

**Debtor Concealed Debts Owed to Insiders**

15.    Debtor's allegation that it was "generally understood" that the monies he borrowed from insiders (amounting to $12,400.00) were not to be repaid (Sobers' Aff. ¶29), is unsupported by anything other than Debtor's own, self-serving statements.

16.    There is absolutely no evidence to establish that any of these insiders actually forgave the debts owed by Debtor.  Rather, the amount of these debts and the description of these transactions, by Sobers in her affirmation in the State Court Action (Creditor's Ex. H, ¶22), and the Debtor's testimony at his 341 meeting (Creditor's Ex. B, p. 29), as these funds having been "borrowed" – without any mention whatsoever about forgiveness –  leads to the obvious conclusion that these were loans to be repaid.

17.    Furthermore, even assuming, arguendo, that these loan were forgiven, the forgiveness of these debts would constitute additional income to the Debtor (amounting to more than his entire annual income as alleged in his filings), which additional income was not disclosed.

18.    The only conclusion can be that Debtor borrowed $12,400.00 from insiders which was still owed at the time of his filing, he failed to disclose these debts in his schedules, he knowingly concealed these debts in his initial testimony at his 341 meeting, and Sobers knew of the existence of these outstanding debts prior to the Debtor's filing, and still they were not disclosed. Debtor's present allegations regarding the "general understanding" that these debts were not to be repaid is nothing more than another obvious fabrication, created by Sobers and Debtor in a vain effort to explain their malfeasance.

**Debtor Failed to Make a Full and Candid Disclosure**

**Garden of Health, Inc.**

19.    Debtor has repeatedly admitted that Garden of Health, Inc. was his business (Creditor's Ex. B, p. 11; Debtor's Aff. ¶22; Sobers' Aff. ¶35).

20. Sobers' assertion that this business was "solely operated by Devani [Debtor's father]" (Sobers' Aff. ¶37), is irrelevant, and again, is unsupported by Debtor's own affidavit.

21. In his affidavit, Debtor states only that Garden of Health was funded by his father, "so that I could start *my own business with my father's help*" (emphasis added)(Debtor's Aff. ¶22). Furthermore, the minimal bank records produced by the Debtor in the State Court Action reveal that Debtor, not his father, signed the checks paid out of the bank account of Garden of Health, Inc. ("Exhibit B" hereto).[2]

22. Furthermore, Debtor's own credit card statement from November 2004 reveals that he utilized his own credit to purchase more than $3,600.00 of products from "Now Foods" and "Select Nutrition" ("Exhibit C" hereto), which were vendors of Garden of Health, Inc. (*See,* Checks 1 – 6 of Exhibit B hereto, checks paid from Garden of Health bank account to Now Foods and Select Nutrition).

23. Debtor was the sole owner of, paid the bills for, managed the bank account of, and purchased inventory for, Garden of Health, Inc. – it was <u>not</u> operated solely by Debtor's father.

24. Sobers' attempt to justify the failure to disclose this ownership interest, that the company allegedly had no assets or ceased operating, is not a valid excuse for nondisclosure.

25. Full and complete disclosure is required in bankruptcy petitions, schedules and statements, and it is not for the Debtor to make a qualitative analysis as to whether a business interest is of sufficient value or duration to warrant disclosure. [*See,* <u>In re Parikh</u>; <u>In re Nazzaro</u>, (Bankr. E.D.N.Y. 2013); <u>In re Bressler</u>, 387 B.R. 446, 461 (Bankr.S.D.N.Y.2008) (stating the debtor's duty is to "provide reliable information to those who have an interest in the administration of the estate," rather than to evaluate what assets have value enough to be reported)].

---

[2]    Only a sample of the relevant checks signed by Debtor is annexed hereto, to avoid production of excessive and unnecessary documentation.  Additional checks are available upon request.

26.     A statement or omission is material if it is "related to the debtor's business transactions, concerns the discovery of assets, business dealings, or the existence or disposition of the debtor's property" [In re Gardner, 384 B.R. 654 (Bankr.S.D.N.Y.2008) (*citing* 6 Collier on Bankruptcy at ¶ 727.06-07); *see also,* In re Sapru, 127 B.R. 306, 315 (Bankr. E.D.N.Y. 1991) (stating same). Consequently, it is not a defense for a debtor that the false statement or omission concerned property of inconsequential monetary value [*See,* Id.; *see also,* In re Diodati, 9 B.R. 804, 808 (Bankr. D.Mass.1981) (stating "the duty is on the Defendant to answer, and not evaluate.")].

27.     Furthermore, the allegation that Garden of Health, Inc. ever ceased operating is wholly unsupported.  Debtor has failed to ever produce any of the financial, accounting and tax records for this business, certificate of dissolution, or any other corporate records to support his claim that this business ever ceased operating.

28.     According to the New York State Division of Corporations, this corporation remained active through January 2011, when it was only annulled for non-payment of taxes (Creditor's Ex. J).  Accordingly, Debtor was required to disclose it, at the very least, in his Statement of Financial Affairs, Item 18.

29.     Regardless, the mere fact that it was annulled by the state tax authority did not dissolve the corporation, and Debtor's ownership of this entity continues to the present.  Therefore, Debtor was required to disclose it in his Schedule B as well as in his Statement of Financial Affairs.

30.     Debtor and Sobers knew of Debtor's 100% ownership interest in Garden of Health, Inc. prior to the Debtor's filing, and their knowing failure to disclose it in the Debtor's initial filings, and the failure to amend the filings even after being reminded of this interest at the 341 meeting, simply cannot be excused – regardless of their unsupported belief as to its value.

31.     The Court should take further notice that Debtor, in his Opposition, has admitted to all of the elements to establish the intentional fraudulent conveyances which formed the basis for Creditor's Judgment – despite his repeated assertion that he did not have fraudulent intent.

32.     New York Debtor and Creditor Law § 276 provides that, "[e]very conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors." Debtor and Creditor Law § 276 addresses actual fraud, as opposed to constructive fraud, and does not require proof of unfair consideration or insolvency [*see,* United States v Carlin, 948 F.Supp. 271 (S.D.N.Y. 1996)]. Due to the difficulty of proving actual intent to hinder, delay, or defraud creditors, the pleader is allowed to rely on "badges of fraud" to support his case, i.e., circumstances so commonly associated with fraudulent transfers "`that their presence gives rise to an inference of intent'" [Pen Pak Corp. v LaSalle Natl. Bank, 240 AD2d 384, 386 (2nd Dept. 1997)]. Among such circumstances are: a close relationship between the parties to the alleged fraudulent transaction; a questionable transfer not in the usual course of business; inadequacy of the consideration; the transferor's knowledge of the creditor's claim and the inability to pay it; and retention of control of the property by the transferor after the conveyance. [Id.].

33.     In the case of the transfers to Debtor from his father in late July and early August 2004:  (i) there is the obvious father-son relationship; (ii) the transfers of funds from the father to the son occurred at a time when the father was indebted to Creditor, both the father and Debtor knew an action was pending against the father, and shortly before judgment was entered against him, (iii) without any consideration, and (iv) Debtor's father continued to benefit from the funds even after the transfer because the father, as stated in the Opposition, "operated the business to his and his family's benefit."

34.     All of the foregoing is admitted to by Debtor in his Opposition (Debtor's Aff. ¶¶9 – 22).  The Court should note that Debtor's Aff. erroneously states that Creditor's first judgment against the father was obtained in October 2005.  In fact, the State Supreme Court awarded Creditor his first judgment against Debtor's father by its order dated August 19, 2004 ("Exhibit D" hereto), and the judgment was actually entered on October 21, 2004 (Id.).

35.     In addition to all of the foregoing, Debtor even admits his knowledge that the transfers from his father to him and his business were made with <u>actual</u> fraudulent intent.  In his affirmation Debtor states that his father's funds were used to start his business, Garden of Health, Inc., "because my father had judgments against him that made it difficult for him to deal with vendors" (Debtor's Aff. ¶22).  The Debtor has admitted his actual knowledge that these transfers were made to conceal his father's assets from his judgment creditors and vendors seeking payment.[3]

**BWELL4EVER and Veda Medica, LLC**

36.     Debtor and Sobers never disclosed the Debtor's ownership interest in BWELL4EVER or Veda Medica, LLC in the Debtor's initial filings (Creditor's Ex. A), and never amended them thereafter to make these disclosures.

37.     Debtor admitted his ownership of an interest in BWELL4EVER in his affidavit submitted to this Court (Dkt. #22).

38.     In the Opposition, it is admitted that these businesses were incorporated in Debtor's name (Sober's Aff. ¶44).

---

[3]     Sobers also confirms this in her affirmation, when she states that Garden of Health was, "to benefit both Debtor and *to circumvent his bad credit with vendors*" (Sobers' Aff. ¶36).  "Circumvent" apparently being used by Sobers to avoid using the proper term - defraud. Equally fraudulent was the Debtor's father's use of the Debtor's bank accounts as his own (Sobers' Aff. ¶10).  What other reason, than to hide his assets from his creditors, would the father have for not using his own bank accounts.  The father was defrauding his creditors and Debtor was aiding this fraud by allowing him to use his bank accounts to do so.

39.     The Opposition completely fails to address the failure of Debtor and Sobers to disclose the ownership interests in these businesses in Debtor's filings, in both Schedule B and the Statement of Financial Affairs, Item 18.

40.     Instead, Sobers merely claims that she and Debtor "inadvertently" failed to disclose these companies *as being the source of Debtor's income* (Sober's Aff. ¶45) – no excuse is offered for failing to disclose the Debtor's ownership interest.

41.     Sobers' assertion that this nondisclosure, "did not have an effect in the potential distribution of the estate as the value of debtor's estate did not change in any way by the inadvertence" (Sobers' Aff. ¶47) is simply false.  The disclosure of Debtor's ownership interests in two ongoing businesses (generating substantial revenues from the few bank records produced – *see, Creditor's Ex. P*) would certainly increase the value of the Debtor's estate.  However, due to the Debtor's failure to produce any of the financial, accounting and tax records (in addition to numerous other corporate and bank records) for these businesses, the value of these businesses cannot be independently determined.  Sobers' additional claim that, "Creditor cannot claim to be prejudiced by the omission" (Sobers' Aff. ¶48) is completely misplaced, and irrelevant [*See,* In re Bressler; In re Klutchko, 338 B.R. 554 (S.D.N.Y. 2005) (stating that omitted or incorrect information may be material even if ultimately the failure to disclose was not prejudicial to creditors; it is left to the creditors or parties-in-interest to judge whether that information will aid them or prejudice them)].

42.     In addition, the Opposition completely fails to adequately address the Debtor's material, and knowingly false testimony at his 341 meeting, where he testified that these businesses were owned solely by his father and mother (Creditor's Ex. B, pp. 3 – 4).

43.     Debtor's claim that he was the owner of too many businesses to keep track of, and that this is the reason that he did not remember that he was presently an owner of BWELL4EVER and Veda Medica, LLC at his 341 meeting (Debtor's Aff. ¶56) is simply not reasonable.  The Debtor

submitted his affidavit with the Court *the day before his meeting*, wherein Debtor admitted to his ownership interest in BWELL4EVER (Creditor's Ex. K, ¶ 8). It defies reason that Debtor would remember his interest to prepare the affidavit but forget that interest almost immediately.

44.     Given that they failed to disclose the Debtor's ownership interest in these companies, and in light of the numerous other misstatements and omissions in Debtor's filings, and Debtor's false testimony at his 341 meeting, the alleged "inadvertent" failure to disclose these companies *as being the source of Debtor's income* only further supports the finding that the nondisclosure of Debtor's actual ownership of these entities was material, knowing, and exhibited a total disregard for the accuracy and completeness of Debtor's filings.

**Nutrifood, Inc**.

45.     In the Opposition, it is admitted that Nutrifood, Inc. is owned, at least in part, by the Debtor (Sober's Aff. ¶49; Debtor's Aff. ¶25).

46.     Contrary to Sobers' attempt, *unsupported by Debtor's own affidavit*, to characterize Debtor's involvement in this business as being nothing more than "helping out in his free time" (Sobers' Aff. ¶51), and stating that Debtor was not involved in the keeping of the corporate records, Debtor's involvement in this business was that of an owner, active officer, and assistant store manager.

47.     The records show that Debtor was an officer, and a "primary user" of the business bank account, of Nutrifood, Inc. (Creditor's Ex. M), and performed the duties of an officer of that company when he executed and submitted an affidavit as an officer thereof in response to the 2004 subpoena served on Nutrifood, Inc. in Debtor's father's Chapter 7 case (Creditor's Ex. L) – in which Debtor: (i) stated that various records never existed, (ii) stated that records were being searched for, and (iii) produced a very few of the demanded documents – which are those under Creditor's Ex. M.

48.     Furthermore, the fact that Nutrifood, Inc. was held in contempt and sanctioned by Your Honor for more than $21,000.00 (which has never been paid), because of Debtor's own failure to comply with the subpoena in his father's bankruptcy, would surely stick out in Debtor's memory.

49.     Moreover, in his XING profile (Ex. B hereto), Debtor is self-identified as the "Assistant Manager" of Quantum Leap Natural Market.  Quantum Leap Natural Market is the name of the health food store owned and operated by Nutrifood, Inc. (Debtor's Aff. ¶25).

50.     Other than Sobers' unsupported claim that Debtor was not significantly involved in the operations of Nutrifood, Inc., the Opposition does not in any way dispute the fact that Debtor owns an interest in, and is an officer of, this business, was obligated to keep records of that business, and that Debtor failed to produce those records and failed to disclose his ownership interest and position as officer in that corporation in his filings.

51.     The Debtor's assertion that, "Nutrifood, Inc./Quantum Leap ultimately failed as well with no assets to be recovered" (Debtor's Aff. ¶25) is unsupported by any evidence whatsoever, as Debtor has failed to produce any of the financial statements, accounting records, tax returns, bank statements, or any other corporate records for this company whatsoever.  And, Debtor has utterly failed to present this Court with any reason for his failure to produce such records.

52.     Finally, pursuant to the records of the New York State Division of Corporations, Nutrifood, Inc. remains an active corporation to this day ("Exhibit E" hereto).

53.     Debtor had an obligation to disclose his ownership interest and position as officer of Nutrifood, Inc. in his filings and has provided no excuse for failing to do so.  He has equally failed to provide any explanation for his false testimony at his 341 meeting, when he testified that he has never owned any other businesses – failing to disclose his ownership of Nutrifood, Inc.

**Undisclosed Debts**

54.     As discussed above, there is absolutely no support for the Debtor's allegation that the $12,400.00 he borrowed from insiders was not expected to be repaid, and Debtor has failed to provide an adequate excuse for his failure to disclose these debts in his filings, and for his false testimony regarding them at his 341 meeting.

55.     Equally, Sobers failed to provide any justification for her failure to see to the disclosure these debts in the Debtor's filings despite her actual knowledge of these debts prior to the filing.

**Undisclosed Potential Claims for Recovery of Monies**

56.     The Opposition completely fails to refute the facts that Debtor had potential claims for breach of fiduciary duty and misappropriation of funds against Debtor's former business partner based upon her depletion of the business bank accounts of more than $40,000.00 in one day,[4] without the Debtor's knowledge or consent (Creditor's Ex. K, ¶5), which caused the Debtor's businesses to fail, just months prior to the Debtor's bankruptcy filing (Creditor's Ex. B, pp. 21 -21; Ex. H, ¶19; Ex. O, ¶¶10 – 11).

57.     Equally, Sobers has failed to provide any justification for her failure to see to the disclosure of these potential claims in the Debtor's filings despite her actual knowledge of these claims prior to the filing (Creditor's Ex. H, ¶19).

58.     Debtor's explanation, that because Ms. Lamantia had put money into the business and she had personally loaned the Debtor money and co-signed his auto lease (both of which are not disclosed in the Debtor's filings), "there was not much we could do or say" (Debtor's Aff. ¶43) falls far short of justifying his failure to disclose the claims.  A partner in a closely-held corporation

_____

[4]     As detailed in the partial bank statement produced by the Debtor as an exhibit to his affidavit in the State Court Action (last page of Creditor's Ex. O), in excess of $40,000.00 was transferred out of, and/or withdrawn from, the bank account of the Debtor's business owned jointly with Ms. Lamantia.

cannot simply decide one day, without the knowledge of her partner, to drain the business bank account of all operating capital, and cause the business to fail. There are legal procedures for divestment/dissolution that must be followed – and consequences for not doing so.

59. The facts are undisputed, Debtor's partner drained the business bank account of more than $40,000.00 in a single day without Debtor's consent or knowledge, and without any court accounting/dissolution or other legal proceeding as required, and thereby caused the business to fail. Ms. Lamantia misappropriated $40,000.00 from the Debtor's business, and breached her fiduciary duty owed to Debtor, as the other shareholder in the closely-held corporation, when she acted in her own self-interest to the detriment of the business and Debtor. And, those claims were known to Debtor and Sobers before the filing, were material, and intentionally not disclosed.

**Debtor's Alleged Salary**

60. The Opposition completely fails to address the failure of Debtor to produce any documentation to allow for an independent verification of his alleged $1,000 monthly salary. This alleged miniscule salary is paid to him by a company or companies in which he admittedly has an ownership interest, and the other alleged owners are his mother and father. There is simply no excuse for the failure to produce these documents.

61. The Opposition completely fails to address Debtor's failure to produce documentation of the lease for the rental of the residence in which he lives – or to explain how a family of four living in Floral Park, New York pays rent (disclosed by the Debtor's father in his 2006 petition as being $2,000 monthly), and still survives on the $24,000 annual household income disclosed in Debtor's filings.

**Failure to Keep, Maintain and Produce Documentation**

    **Personal Records**

62.    The Opposition completely fails to address Debtor's failure to keep, maintain and produce, in response to Creditor's 2004 Subpoena and the Court's Examination Order, among other records, even a single bank statement, cancelled check, credit card statement, or individual tax return of the Debtor for the three (3) years preceding his filing.

    **Business Records**

63.    The sole explanation offered for Debtor's failure to produce any of the company financial and accounting records, bank records, tax returns, and numerous other business records, for his *numerous* businesses for the six (6) years required by Creditor's 2004 Subpoena and the Examination Order, that Debtor's "role in these companies were limited, it was in fact [Debtor's father] that ran the entities" (Sobers' Aff. ¶72) is another fabrication, and is wholly insufficient to justify Debtor's failure to produce them.

64.    First, this claim ignores that fact that Debtor was the sole owner, or at least a part owner, in each of the numerous businesses at issue, and was thus required to keep and maintain records for those businesses.

65.    Second, as set forth above, this claim is entirely without merit. Debtor was/is an owner, officer, and actively involved in the operation of these businesses.

66.    And finally, notwithstanding the foregoing, the Debtor allegedly lives and works with his father. Even if the claim was not completely made up, there is simply no excuse for Debtor not to be able to obtain these records.

**Misstatements and Omissions in Petition and Schedules**

67.    Again, Sobers' attempt to raise the Debtor's belief that the companies were without value as justification for not disclosing those companies in the Debtor's filings is of no moment

[*See,* In re Parikh; In re Nazzaro; In re Bressler, et. al. *supra*]. Furthermore, this claim is in conflict with the Debtor's assertion (albeit a ridiculous one) that he forgot that he owned an interest in these companies (Debtor's Aff. ¶56). If Debtor truly forgot that he owned an interest in them, there would have been no reason for them to make any determination as to their value so as to not disclose them.

68.    Other than the foregoing, the Opposition completely fails to address the other numerous misstatements and omissions as detailed in Creditor's motion.

69.    The multitude of misstatements and omissions, particularly coupled with the facts of Debtor's false 341 meeting testimony, failure to produce documentation, and the actual prior knowledge of Sobers, can only lead to the conclusion that Debtor's misstatements and omissions were material, knowing, and constituted a gross disregard for the accuracy and completeness of his filings. And, that Debtor failed to make a full and candid disclosure in his filings.

## CREDITOR'S ATTORNEY'S FEES AND COSTS

70.    Sobers' claim that Creditor and the undersigned have somehow taken advantage of "creditors' rights" in obtaining ever increasing judgments and awards against Debtor, Debtor's father and his co-debtor, is absurd, and completely ignores the fact that the increase in these judgments and awards is due to their own conduct and failure to pay.

71.    Just as Judge Grossman found in Creditor's action against the father's co-debtor, Sunil Parikh, "the dramatic increase in the [Creditor's] claim above the actual damages is the result of the Debtor's own conduct" [In re Parikh, at 24]. Had the combined debtors simply paid the judgments, and not engaged in frivolous and contemptuous conduct, meritless motion practice, meritless appellate practice, concealed and fraudulently conveyed assets, and made bad faith bankruptcy filings, Creditor would have been paid and there would have been no increase in the original damages to which Creditor was entitled. Instead, these persons engaged the services of

multiple attorneys (which they allegedly could never afford), at great costs to themselves, and engaged in the foregoing conduct at their own peril.

72.      The few charges for legal fees of the undersigned with which Sobers has taken issue are addressed individually as follows:

(i)  challenge with respect to 4.50 hours of preparation for 341 meeting (Sobers' Aff. ¶88).  On September 16, 2013, I spent 2.50 hours preparing for the 341 meeting which was then scheduled for September 23, 2013.  However, that meeting was then adjourned to October 16, 2013.  On October 15, 2013, I spent and additional 2.00 hours preparing for the meeting, which was held the next day.  As the Court can see, this matter has roots stretching back to 2000 when the Debtor's father purchased the Creditor's business, and extensive activity for the next 13 years.  There are volumes of documents and transactions which had to be reviewed and dates and persons, and company names, all of which had to be organized and compiled in my mind, notes and files in order to be properly prepared to participate in the Debtor's 341 meeting.  In fact, I spent far more time preparing for the 341 meetings then I actually ended up billing.

(ii)      challenge with respect to time spent reviewing Court orders authorizing the 2004 examination of Debtor (Sobers' Aff. ¶88).  I spent less than 15 minutes reviewing the Court's order to determine whether it was worded as expected and to determine if any changes had been made to the order as proposed, and the method and timing of service required.  I billed 0.20 hours for this work – which is less than 15 minutes, and which is actually the minimum charge for legal services rendered for any particular work done pursuant to my standard retainer agreement.

(iii)     challenge with respect to legal research, drafting and additional legal research in this matter (Sobers' Aff. ¶¶89 – 90).  Sobers' claim that that these billing items were "dubious at best" and that they were in some way "duplicative of previous efforts," completely ignores the facts that every bankruptcy filing and debtor is unique due to the status and conduct of the debtor, his

business interests, the particular history of transactions and litigation, and the issues raised by same, and the fact the law changes and new case law arises. My time billed for legal research and drafting was all reasonable and necessarily incurred in this matter. Again, I ended up billing far less than the actual time spent on these matters – in order to remove any doubt as to their reasonableness.

## IMPOSITION OF SANCTIONS AGAINST DEBTOR

73.     As established in Creditor's motion papers and memorandum of law, and reiterated herein, Debtor filed his Chapter 7 case in bad faith.

74.     Debtor filed his case in response to Creditor's Judgment and enforcement efforts thereof, to frustrate Creditor, and immediately following his failed, meritless efforts to challenge the Judgment in the State Court, wherein he was facing an imminent contempt motion due to his failure to comply with subpoenas served by Creditor.

75.     Debtor failed to make any attempt to pay the Judgment since its entry against him in March 2013, despite his seeming ability to raise funds when needed.

76.     Debtor favored insiders by knowingly failing to disclose debts he owed to them in his petition while seeking the discharge of his other debts.

77.     Debtor effected multiple intentional fraudulent conveyances of his father's assets to defraud his father's creditors – particularly Creditor.

78.     Debtor failed to make a full and candid disclosure by: (i) knowingly concealing his ownership and position as officer in numerous businesses; (ii) filing a petition, schedules, and statements which were replete with material, knowing misstatements and omissions; (iii) providing false testimony at his 341 meeting; and (iv) failing to keep, maintain and produce the vast majority of documents concerning his financial condition and business interests.

79.     And, Debtor signed and filed his Petition, Schedules and Statements knowing that they were wholly incomplete and inaccurate.

80. Debtor has failed to adequately refute any of the foregoing, and has failed present any meritorious defense to the imposition of sanctions against him.

81. The Debtor's bad faith filing and egregious conduct warrant the imposition of sanctions under Rule 9011 of the Bankruptcy Rules and Section 105(a) of the Bankruptcy Code, consisting of the award to Creditor of his legal fees and costs incurred in dealing with the Debtor's filing.

## IMPOSITION OF SANCTIONS AGAINST SOBERS & SOBERS LAW

82. Initially, Sobers and Sobers Law have failed to establish any "exceptional circumstances" which would restrict holding Sobers Law jointly responsible for the sanctions imposed upon Sobers.

83. Sobers signed Debtor's filings as an attorney of Sobers Law.

84. Sobers had prior, actual knowledge that Debtor was filing his Chapter 7 case in response to Creditor's Judgment and enforcement efforts thereof.

85. Sobers had prior, actual knowledge that the $12,400.00 disclosed in Debtor's filings was being held in escrow to be paid to Creditor prior to Debtor's filing, and that her co-counsel in the State Court Action refused to turn over those funds to allow Debtor to file, and to impair and impede Creditor from obtaining those funds.

86. Sobers had prior, actual knowledge that Creditor's Judgment amounted to 97% of Debtor's actual disclosed debts.

87. Sobers had prior, actual knowledge of the multiple intentional fraudulent conveyances effected by the Debtor with his father with the intent to defraud Creditor.

88. Sobers had prior, actual knowledge that Debtor owed debts to insiders which were not disclosed in Debtor's filings.

89.     Sobers had prior, actual knowledge of Debtor's ownership interest and position as officer in numerous businesses which were not disclosed in the Debtor's filings.

90.     Sobers defense, that she believed, without any documentation whatsoever to support such belief, that the companies did not have to be disclosed because Debtor believed they had no value (Def. Memo ¶87), was neither reasonable nor supported by law.

91.     Sobers only other defense, that she believed that these companies "were no longer current entities", is baseless and is directly contradicted by the documentation available.  And, a quick visit to the New York State Division of Corporations website would have disproved Sobers of her mistaken, misplaced and improper belief.  Moreover, there is absolutely no documentation or reasonable basis to believe that these companies ever ceased operating.

92.     Sobers has completely failed to address any of the other numerous misstatements and omissions in the Debtor's filings as detailed in Creditor's motion, almost all of which were known to Sobers prior to the filing.  Those few which may not have been known, would have been easily determined by even the most cursory investigation of the Debtor – much less a reasonable investigation of the Debtor under the circumstances.

93.     Sobers failed to ever amend the Debtor's filings to disclose those assets and the material information of which she had actual knowledge as well as the same of which she was reminded of at the 341 meeting and by the documentation produced by the Debtor in this case.

94.     There can be no doubt that Sobers failed to conduct a reasonable investigation of the Debtor in this case.

95.     Sobers signed and certified Debtor's filings as complete and accurate despite her prior, actual knowledge that they were, in fact, wholly incomplete and inaccurate.

96.     Sobers knew that Debtor's case was being filed in bad faith, and was forewarned that that it would be met with the instant motion.

97.     The imposition of sanctions, in the amount of Creditor's legal fees and costs incurred in dealing with Debtor's filing, against Sobers and Sobers Law pursuant to Rule 9011 of the Bankruptcy Rules, Section 105(a) of the Bankruptcy Code and 28 U.S.C. §1927, is warranted, just and proper in this case.

## ADDITIONAL ATTORNEY'S FEES AND COSTS

98.     Creditor has incurred the additional amount of legal fees and costs in responding to the Opposition in the amount of **$6,191.85**, as detailed in the invoices annexed hereto as "Exhibit F".  These fees and costs were reasonably and necessarily incurred.


**WHEREFORE,** Creditor respectfully requests an Order of this Court as detailed in his prior submitted papers with the addition of $6,191.85 to the award of sanctions sought.

Dated: Huntington, New York
        February 3, 2014

                                                  /s/  John S. Desiderio, Esq.
JOHN S. DESIDERIO (JSD 4835)
Attorney for Creditor John Desiderio, Sr.
50 Gerard Street, Suite 100A
Huntington, New York  11743
(718) 757-9477